**In re AIR CRASH DISASTER AT NEW ORLEANS, LOUISIANA on July 9, 1982.**

**Pearl Crosby EYMARD, et al., Plaintiffs-Appellees,**

v.

**PAN AMERICAN WORLD AIRWAYS, Defendant-Appellant.**

**No. 85–3270.**

United States Court of Appeals, Fifth Circuit.

Aug. 6, 1986.

Robert E. Kerrigan, Jr., Marc J. Yellin, New Orleans, La., for defendant-appellant.

Robert M. Murphy, Wendell H. Gauthier, Metairie, La., for plaintiffs-appellees.

Before WISDOM, RUBIN, and HIGGIN-BOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Pan American World Airways Flight 759 crashed on takeoff from the New Orleans airport on July 9, 1982. In this appeal, we apply the substantive law of Louisiana in reviewing judgments for three children whose parents were among the 138 passengers killed when the Boeing 727 disintegrated on impact. Pan American challenges the allowance of loss of inheritance damages; the amount of the primary damage award; and numerous rulings by the court below. We are persuaded that the evidence in support of the claimed loss of inheritance was too speculative and that the remaining awards of the jury were so excessive as to require a new trial. We

reverse in part, vacate in part, and remand for a new trial.

## I

When Flight 759 crashed, Ted and Margaret Eymard had three children: Ted, Jr., age 9; Natalie, age 6; and Tenille, age 3. Margaret was in her last trimester of pregnancy with a fourth child at her death.

This diversity suit against Pan American was brought on behalf of the children by Pearl Crosby Eymard, their paternal grandmother and legal guardian. Pan American conceded liability before trial and the amount of damages was the only issue before the jury. Most of the trial testimony focused on the prospects that a number of marine companies, owned and operated by Ted Eymard, Sr. and various relatives, had at the time of Eymard's death.

Sometime after the air crash, the Eymard companies entered into Chapter 11 bankruptcy. The parties disputed the amount of future income Ted Eymard, Sr. would have had available to spend on behalf of his children had he lived, and how much he would have ultimately accumulated for their inheritance. Plaintiffs' evidence tended to show that Ted Eymard was the key figure in the management of the Eymard companies, which grew under his direction from a four or five boat operation to a group of companies grossing approximately $11 million per year at the time of his death. Witnesses for the plaintiffs testified that without Ted's financial and organizational leadership, and his entrepreneurial vision, the companies were unable to weather a down cycle in the marine industry similar to others they had survived under Ted's direction in the 1970's. Witnesses for Pan American, on the other hand, contended that Ted died just before a downturn in the Louisiana marine industry more serious than those already experienced, and that an unwise purchase of an offshore business, coupled with the highly-leveraged nature of the companies, made bankruptcy inevitable even had he lived. Other testimony focused on the Eymard's relationship with the children, their spending habits and assets, the future financial needs of the children, and details of the crash.

The jury awarded the children a total of $3,600,000. Responding to global inquiries, the jury awarded each child $1,100,000 for all their damages arising out of the loss of their parents, excluding their loss of inheritance. The jury also awarded $100,000 to each child for loss of inheritance. The trial judge denied Pan American's post-trial motions for a new trial, for judgment notwithstanding the verdict, and to amend the judgment.

Pan American raises numerous issues on appeal, but we reach only two: whether an award for loss of inheritance should have been allowed, and whether the primary award was excessive.

## II

Recovery for loss of inheritance under Louisiana law was vigorously disputed at trial. Given its uncertainty under Louisiana tort law, the trial judge wisely separated it from the other elements of damage, allowing the jury to make an award without visiting its uncertain status upon the other claims.

Recently, in *Marks v. Pan American Airways, Inc.*, 785 F.2d 539 (5th Cir.1986), we faced the issue of whether loss of inheritance is a recoverable item of damage in a Louisiana wrongful death action under Louisiana Civil Code art. 2315. We noted that an early Louisiana case, *Eichorn v. New Orleans C.R. Light & Power Co.*, 114 La. 712, 38 So. 526 (1905), held that loss of inheritance was not recoverable; we also observed, however, that Louisiana's wrongful death statute at that time distinguished between adult and minor children, restricting recovery to spouses and minor children. *Marks*, 785 F.2d at 541. Since *Eichorn*, article 2315 has been amended to put children of the age of majority in the primary class of survivors entitled to bring a wrongful death claim. Because no Louisiana case has squarely decided whether *Eichorn* survived the amendments, we noted that ordinarily, "we would make an *Erie*

prediction of the response of the Louisiana Supreme Court as to *Eichorn's* continued viability." *Id.* at 542. We found such a prediction unnecessary in *Marks,* however, holding that the evidence in support of such an award was too speculative even if allowed under Louisiana law. *Id.* at 542–43.

We reach the same conclusion in this case. As in *Marks,* plaintiffs offered the expert testimony of an economist who projected the decedent's future income from an analysis of his personal tax returns and other financial information pertaining to the Eymard companies. We find the economist's "opinion" that the collective loss of inheritance for the three children was $1,778,873 to be completely airborn, premised as it was on assumptions without basis in the real world of Ted and Margaret Eymard.

–1–

Since the adoption of the Federal Rules of Evidence in 1975, we have accorded trial courts considerable discretion in determining the admissibility of opinion evidence by experts. We have said that the discretion is "broad" and that the determination of admissibility should be sustained "unless manifestly erroneous." *See United States v. Johnson,* 575 F.2d 1347, 1360 (5th Cir. 1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979); *Crawford v. Worth,* 447 F.2d 738, 740–41 (5th Cir.1971). This deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury. Despite the seeming breadth of the language we have used to describe this deference, trial court rulings regarding the admission of expert testimony remain reviewable. We have not left all such decisionmaking to trial judges, nor should we.

■ Basic policy questions that affect the very nature of a trial lie behind decisions to receive expert testimony. Under the Federal Rules of Evidence, experts not only explain evidence, but are themselves sources of evidence. These two roles, though related, are quite distinct. In deciding whether *explanation* by an expert will assist the jury or judge, the superior position of the trial judge over the appellate judge is apparent. By comparison, in deciding whether *evidence* should be allowed from this source, the trial judge draws less upon the scene and the cast immediately before him, and more upon the substantive law. To the extent that the decision to allow expert testimony as a source of evidence is significantly intertwined with the underlying substantive law, we will accord it less deference, and take a much closer look.

For example, in the typical products liability case, the jury is asked to decide whether a product was defective. Stripped to essentials, jury instructions regarding defect are little more than an open-ended request to balance utility and safety. Absence of rigor in the inquiries that determine liability does not necessarily result from poor drafting of the charge; rather, the difficulty is often inherent in the underlying substantive law. This is not the occasion for an attack upon that difficulty. Our point is that the ultimate issue in such cases can too easily become whatever an expert witness says it is, and trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument. Indeed, the premise of receiving expert testimony is that it "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. Rule 702.

Our customary deference also assumes that the trial judge actually exercised his discretion. In saying this, we recognize the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it "the weight it deserves." This nigh reflexive explanation may be sound in some case, but in others it can mask a failure by the trial judge to come to grips with an important trial decision. Trial judges must be sensitive to the qualifications of persons

claiming to be expert. Because the universe of experts is defined only by the virtually infinite variety of fact questions in the trial courts, the signals of competence cannot be catalogued. Nevertheless, there are almost always signs both of competence and of the contribution such experts can make to a clear presentation of the dispute. While we leave their detection to the good sense and instincts of the trial judges, we point by way of example to two. First, many experts are members of the academic community who supplement their teaching salaries with consulting work. We know from our judicial experience that many such able persons present studies and express opinions that they might not be willing to express in an article submitted to a refereed journal of their discipline or in other contexts subject to peer review. We think that is one important signal, along with many others, that ought to be considered in deciding whether to accept expert testimony. Second, the professional expert is now commonplace. That a person spends substantially all of his time consulting with attorneys and testifying is not a disqualification. But experts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an "expert."

In sum, we adhere to the deferential standard for review of decisions regarding the admission of testimony by experts. Nevertheless, we take this occasion to caution that the standard leaves appellate judges with a considerable task. We will turn to that task with a sharp eye, particularly in those instances, hopefully few, where the record makes it evident that the decision to receive expert testimony was simply tossed off to the jury under a "let it all in" philosophy. Our message to our able trial colleagues: it is time to take hold of expert testimony in federal trials.

–2–

 The economist in this case testified that over the life of his employment with the Eymard companies, Ted experienced an average annual salary increase of 40% per year. While conceding that Ted's salary could not continue to grow at this rate indefinitely, the economist assumed that his salary would increase by 8%, in real terms, every year until the year 2021. Despite the testimony concerning Ted Eymard's business acumen, we find an assumed 8% annual salary increase continuing over almost 40 years to be unsupported by the record and completely incredible. In reaching this figure, the economist looked solely at Ted Eymard's income in prior years, and he failed to consider either the limits on future expansion that the Eymard companies would encounter as they continued to grow in an already competitive industry; or the depressed state of the marine industry at the time of trial and its cyclical nature in general; or the future personal choices Ted Eymard might make to avoid work-related health or stress problems later in his career.

Even more incredible is a presumption that because Ted Eymard paid only 5% of his income in taxes in earlier years, this artificially low tax rate would continue throughout his career. Testimony at trial indicated that the earlier 5% rate resulted from depreciation on boats owned by the Eymard "subchapter S" companies, and from interest paid on personal debt, which Ted Eymard was able to offset against income in calculating his tax liability. Apart from its insensitivity to the ephemeral character of the tax laws, the assumption ignores the reality that in order to incur the depreciation and interest expenses necessary to maintain a 5% tax rate in 1995 when he would presumably be making approximately $1 million per year, Ted Eymard would have to incur personal debt of $2 million, and expand to a fleet of 129 boats. The company fleet would have to continue increasing by 19 boats per year at a cost of $1 million per boat to 361 ships by the year 2005.[1]

---

1. Even assuming the market could absorb such a large fleet, there was testimony that the companies at that size would probably sell stock and become publicly owned, which would not only

While the Eymards had virtually no savings or money in retirement plans at the time of their deaths, the economist assumed, without any objective basis for doing so, that they would begin saving in 1990 at a rate of 5% of total income, and increase their rate of savings to 20% from the year 2000 on. Furthermore, rather than attempting to calculate probable future consumption of income based on the Eymards' spending habits prior to their death, the economist relied on statistical studies showing how average families consume available income. This was inappropriate, especially in light of testimony that the Eymards' disposition of income was idiosyncratic, and evidence that suggested increasingly significant sums had been spent in previous years on gambling junkets to Las Vegas.

In sum, we find the assumptions of plaintiffs' economist so abusive of the known facts, and so removed from any area of demonstrated expertise, as to provide no reasonable basis for calculating how much of Ted Eymard's income would have found its way into assets or savings to be inherited by his children. An award for damages "cannot stand when the only evidence to support it is speculative or purely conjectural." *Marks*, 785 F.2d at 542 (quoting *Haley v. Pan American World Airways*, 746 F.2d 311 at 316 (5th Cir.1984)). We reverse the award for loss of inheritance and leave for another day the legal question of whether, on less speculative testimony, loss of inheritance damages would be allowed as a matter of Louisiana law.

### III

■ The jury's general damage award of $1,100,000 to each of the Eymard children included the following elements: loss of support from their father; loss of services from their mother; loss of love and affection of both parents; loss of love and affection of the unborn brother who died with his mother; and the pre-impact pain and

suffering of the parents. Pan American argues that the award is excessive, and that the trial judge abused his discretion by submitting a general verdict interrogatory to the jury, over objection by both sides, rather than using special interrogatories on an item-by-item basis. While Fed.R.Civ.P. 49(a) is permissive rather than mandatory, a district court's choice of global over specific interrogatories risks the necessity for retrial of the entire case should any of the included elements in the general award be disallowed on appeal.

In a case like this one, involving numerous elements of damages, the use of a general verdict interrogatory masks the individual amounts that the jury actually awarded for each element. If we presume that the jury awarded no more than the maximum allowable amount for each element of the general award, the total award in this case exceeds this circuit's maximum recovery rule. *See Marks v. Pan American Airways, Inc.*, 785 F.2d 539, 540–41 (5th Cir.1986). We are unable to make such an assumption and order remittitur to a figure representing the total of the maximum allowable amounts because the jury's actual award may have been excessive as to one or two elements only; as to the others, the jury may have intended to award significantly less than the maximum permissible amount of damages. Whenever a general award that includes numerous elements of damages is greater than the legal maximum recoverable for any one element, it is impossible to determine on appeal whether the award is excessive or not: the jury may have awarded an excessive amount for that one item and nothing at all for the remaining elements. *Cf. Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1085–86 (7th Cir.1978). We recognize the considerable discretion of a trial judge to choose between special interrogatories and a general charge. *See* Wright & Miller, Federal Practices and Procedures: Civil § 2505 ("never appears to have been a

result in a sharp decrease in Ted's salary, but would also preclude him from deducting depre-

ciation on the ships from his personal income.

reversal on this ground.") But because of the general verdict in this case, and the failure of the trial court to submit special interrogatories to the jury on the individual elements of damage, a new trial is required on the elements comprising the general award.

■ The first element of damages was for the childrens' loss of support from their father. Plaintiffs suggest in their brief that the jury award for this element was approximately $300,000. This figure, however, is unsupported by the record. The testimony of plaintiffs' economist concerned only the "pool" of income that would be available to the children, calculated by estimating their father's income stream, and then backing out the parents' consumption. Apart from the erroneous assumptions inherent in this testimony, which we addressed in section II, plaintiffs' theory is flawed by the additional assumption that all income in the pool would actually be used in support of the children. Pan American's expert, by contrast, testified as to the amount the parents in all probability would *actually* have spent on the children for clothes, food, education, and other needs. His conservative estimate of $111,000 per child included both past and future loss of support. In the absence of any other testimony in the record as to how much the Eymards would have actually spent in support of the children, this is the highest figure the jury could reasonably have awarded for loss of support on this record.[2]

■ As to loss of services of the mother, plaintiffs' expert proposed that approximately $150,000 per child will be required to replace her services, based on the cost of hiring a full-time live-in "mother substitute" at $70 per day until the youngest child reaches majority. This amount is ex-

cessive because it fails to consider the declining amount of time required to provide such services as children mature. Taking that factor into account, we find that half the amount calculated by plaintiff's expert, or $75,000 per child, is the upper limit of an award for loss of services on this record.

The largest and most intangible element of damages was for the childrens' loss of love and affection of both parents. In *Marks v. Pan American World Airways, Inc.*, 785 F.2d 539 (5th Cir.1986), where four children lost both parents in this same crash, we upheld an award of $250,000 per parent to each child for loss of love and affection, stating that it was "within the parameters of this circuit's maximum recovery rule," *id.* at 541, and pointing to a $300,000 award to a four-year old child in *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778 (5th Cir.1983), for the loss of love and affection of one parent. In accord with the upper bound set in *Caldarera,* the maximum amount the jury could have awarded each Eymard child for the loss of love and affection of both parents was $600,000 per child.

■ The jury was also instructed that they could award each child damages for the loss of love and affection of the unborn brother killed in the crash with Margaret Eymard. Pan American argues that no Louisiana case has ever allowed a sibling to recover for the loss of affection of an unborn brother or sister, and that such damages were foreclosed here. We are constrained to disagree. In *Danos v. St. Pierre*, 402 So.2d 633 (La.1981), the Louisiana Supreme Court held that, under Louisiana Civil Code art. 2315, the parents of an unborn child may recover the damages they sustain when a tortfeasor's act results in the child's death. The statute in question provides a cause of action not only for

2. We note that the jury's award for each child was identical, but that the parents, had they lived, probably would have provided fewer years of service and support to the oldest child, Ted, than to the younger children, Natalie and Tenille, who would have lived at home longer. An adjustment would not affect Pan American's total liability, however: because the testimony at trial was addressed to the amount necessary to recompense the children as a group, any adjustment downward of the oldest child's award would be offset by a corresponding upward adjustment for the younger children. On retrial, the use of special interrogatories and proper jury instructions should eliminate this discrepancy.

the parents of a deceased person, but also for "the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving." La. Civ.Code Ann. art. 2315(D)(1)(c). There is no reason to suppose that, having recognized a cause of action for the wrongful death of an unborn child, the Louisiana courts would avoid the plain language of the statute, and limit such an award to parents.

 In *Danos*, a father was awarded $10,000 for loss of his unborn child. Because the value of such a loss is so inherently incalculable, we decline to allow a damage award on an analogous claim exceeding that already awarded in the Louisiana courts. We therefore find that the maximum the jury could have awarded each of the Eymard children for the loss of love and affection for their unborn brother was $10,000.

 The final element of damages was for the pre-impact pain and suffering of the parents. Pan American argues that the district court should have directed a verdict on the issue of pre-impact pain and suffering because of insufficient evidence. One witness testified that he saw the plane lose altitude, clip power lines and trees, roll to one side, and finally explode several blocks from where he stood. Another witness heard the plane blow up and the screams of people inside the plane. In *In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982*, 789 F.2d 1092, 1098–99 (5th Cir.1986), we held that nearly identical evidence was sufficient to raise a jury issue. However, we also held that on the evidence presented the award should not have exceeded $7,500 for each decedent. *Id.* Accordingly, a directed verdict on this issue was properly denied, but the maximum allowable recovery was $7,500 per parent, for a total of $5,000 per child.

In conclusion, the table set out in the margin summarizes the maximum awards we find allowable, per child, for each element of damage on the record before us.[3] We are unable to order remittitur of the $1,100,000 award to $801,000 because, as discussed earlier, the jury may not actually have intended to award the maximum amount for each item of damages. We therefore vacate the general award, remand for a new trial, and direct the district court to use special interrogatories in submitting the case to the jury.

## IV

Pan American raises numerous other legal, procedural, and evidentiary issues. Several of these have been resolved already in other cases involving this same accident. The remainder are either unlikely to arise again on retrial, are within the discretion of the trial judge, or are resolved by our order of a new trial.

REVERSED in part, VACATED in part, REMANDED for a new trial.

| | |
|---|---|
| Loss of support (from father) | $111,000.00 |
| Loss of services (from mother) | 75,000.00 |
| Loss of love and affection of both parents | 600,000.00 |
| Loss of love and affection of unborn brother | $ 10,000.00 |
| Pre-impact pain and suffering of parents ($15,000/3) | 5,000.00 |
| Total Award | $801,000.00 |