# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31326

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2015

Lyle W. Cayce
Clerk

MARK BARTO,

Plaintiff - Appellee

v.

SHORE CONSTRUCTION, L.L.C.; MCDERMOTT, INCORPORATED,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before BENAVIDES, CLEMENT, and HIGGINSON, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Mark Barto, an employee of Shore Construction, L.L.C., ("Shore") was hurt when he fell while working on a derrick barge operated by McDermott, Inc. ("McDermott"). Barto sued McDermott under the Jones Act. He also sued Shore for cure under maritime law. After a bench trial, the district court entered a judgment against McDermott and Shore. McDermott appeals the district court's finding that it was completely at fault for the accident, as well as several components of the Jones Act damages award. Shore appeals a portion of the cure award. We AFFIRM as to most issues but REVERSE and RENDER as to the award of future lost wages against McDermott.

No. 14-31326

## FACTS AND PROCEEDINGS

Plaintiff-appellee Mark Barto was a Jones Act seaman employed by Shore. Shore assigned him to work as a rigger aboard Derrick Barge 50 ("DB 50"), a derrick barge operated by McDermott.

Barto had an accident while he was working on DB 50. Barto and several other crew members were performing an operation in which a cable was taken from a crane, inspected and subjected to maintenance, and spooled onto a large spooling machine. As the spooling machine slowly turned to reel in the cable, Barto was responsible for guiding the cable by tapping it to ensure that the cable lines did not overlap. He was offered no guidance on how to perform this task, which is not routine but instead is done approximately once every two years. Barto had been working on DB 50 for about 5 months and had never performed this task before. He was also "one of the lowest ranking riggers on the barge," as well as "the least experienced." The barge's crew included a superintendent, a foreman, several leadermen, and a number of more experienced riggers.

The spooling drum was elevated about eight to ten feet above the deck. To perform his task, Barto first tried to use a two-by-four wooden plank to tap the cable lines into place, which was the method used by the person he had seen performing the task previously. But Barto testified that he began having trouble reaching the spooling drum from the deck. So he decided to get a fir board and lay it across part of the spooling machine's frame so that he could stand on the board. He picked a board that "looked sturdy," although it already had a notch cut out of one end. The notch removed a little over half of the board's width from approximately the last foot of the board's length. After placing the board on the spooling frame, Barto stood on top of the board and used a brass hammer to guide the cables. The district court credited Barto's testimony that he was standing approximately four feet from the deck and that

the board's notched end extended over the frame so that it did not bear any weight.

The district court concluded that Barto's supervisors could easily see him on the board, and that they did not tell him to get down because they did not think it was unsafe. Barto also testified that a leaderman, Rene Vallecillo, came over and talked to Barto while he was standing on the board. Vallecillo told Barto to tap the cable lines if they overlapped on the spool, but he did not tell Barto to get off the board.

In the past, other McDermott employees, including leaderman Vallecillo, had used fir boards as makeshift scaffolding inside the spooling machine's frame. Some McDermott employees had instead performed the task by standing on the frame itself. Other McDermott employees, however, were able to perform the task by standing on the deck and tapping the cable using a two-by-four or even a four-by-four board.

The board on which Barto was standing ultimately broke at the notched end, and Barto fell. The district court found that, given that Barto had placed the board so that the notch overhung the frame, "somehow [the board] apparently moved on him as he was working and broke where the pictures depict that it broke, which is on the end where it was notched out."

After the accident, Barto began having pain in his left leg, lower back, and neck, and he could no longer work. Although Shore paid for most of the maintenance and cure requested by Barto, Shore refused to pay for the lumbar surgery recommended by Barto's neurosurgeon, Dr. Ilyas Munshi. Dr. Munshi recommended the surgery to reduce pain by removing pressure from the nerve sac. About one month before trial, Dr. Munshi performed a three-level laminectomy to remove bone at L2 to L5, which removed the pressure on the nerve sac. He then performed a three-level fusion to strengthen the spine. Shore's expert witness, another neurosurgeon, admitted that Barto's nerve sac

No. 14-31326

was compressed before the surgery but vigorously contested the surgery's necessity, maintaining that Barto's pain was on the wrong side to be caused by the nerve sac compression.

Dr. Munshi testified by deposition about two weeks after performing the surgery. He testified that it was too early to tell whether the surgery was successful, although Barto had reported improvement in his leg pain. Dr. Munshi testified that, even if the surgery was successful, "[t]here's a good chance, the most he may do is light duty work." Dr. Munshi also testified that, given his experience with other patients who had made a good recovery from the surgery he had performed, he "reasonably anticipate[s]" the following restrictions: "no frequent bending [or] stooping," weight lifting restrictions, and restrictions on "[a]nything that puts a lot of stress on his back." These restrictions would relate not only to work but also to recreational activities, and they would be "long-lasting." At trial about one month later, Barto testified that he was not feeling any pain other than some neck pain "[o]ff and on" and some pain from the surgical incision. He testified that, because of the back and neck injuries, he could not do several things he enjoyed, such as "jogging, lifting weights, baseball, basketball, a lot of sports," "yard work," "fix[ing] on my car," and "[p]lay[ing] with my kids."

Barto sued McDermott for Jones Act negligence. He requested damages for, among other things, future lost wages and future "physical and mental pain and suffering and loss of enjoyment of lifestyle." He also sued Shore for cure, requesting that it pay for the surgery performed by Dr. Munshi.

The district court held a bench trial and then ruled from the bench. It held that McDermott was liable under the Jones Act, reasoning that McDermott failed to provide Barto with a safe place to work. The court also held that Barto was not comparatively negligent. As to damages, the court held that McDermott owed Barto $400,000 in future general damages and

No. 14-31326

$300,000 in future lost wages.  Finally, the court held that Shore was liable for the surgery costs as cure.

## STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009) (quoting *In re Mid–South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)) (internal quotation marks omitted).  Reversal is warranted under clear error review only if the court is "left with the definite and firm conviction that a mistake has been committed." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (per curiam) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)) (internal quotation marks omitted).

Despite this court's typical deference to a district court's factual findings, "a judgment based on a factual finding derived from an incorrect understanding of substantive law must be reversed." *Mobil Exploration & Producing U.S., Inc. v. Cajun Const. Servs., Inc.*, 45 F.3d 96, 99 (5th Cir. 1995).

## DISCUSSION

### A. McDermott's Jones Act Liability

McDermott first argues that it is not liable under the Jones Act.  We generally "review a district court's finding of negligence and apportionment of fault for clear error." *Jauch*, 470 F.3d at 213.  But McDermott argues that we should automatically reverse here because the district court misunderstood the law.  *See Mobil Exploration*, 45 F.3d at 99.  Specifically, McDermott argues that the district court erroneously believed that a Jones Act employer has a duty to provide an absolutely safe place to work (rather than a reasonably safe

5

place to work, which is all that is required under *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997) (en banc)).

To demonstrate that the district court misunderstood the law, McDermott relies upon the district court's statement that "[u]nder the Jones Act, of course, the Jones Act employer has a duty, a nondelegable duty to provide a safe place to work." The court also found that "the safe method would have required—should have required proper scaffolding to be erected before employees were required to climb into or onto this spooling machine."

Upon a review of the entire record, we reject McDermott's contention that the experienced district judge misunderstood elementary principles of Jones Act liability. The district court never stated that a Jones Act employer has an absolute duty to provide a safe place to work. Further, the district court stated that "this is more of a negligence case to me than an unseaworthiness case," suggesting that the court recognized that a normal negligence standard of care applies under the Jones Act. Moreover, in their proposed findings of fact and conclusions of law, both parties provided the correct legal standard (ordinary negligence). It seems unlikely that the district court somehow *sua sponte* settled upon an incorrect legal standard. Also, some of the reasoning in the district court's ruling would made little sense if it thought that McDermott had an absolute duty to provide a safe place to work. For example, the court pointed out that "[t]here was scaffolding available on the DB 50. There was even an experienced scaffolding crew . . . ." If McDermott had an absolute duty to provide a safe place to work, it would not matter whether scaffolding was available. Instead, the district court seemed to weigh this fact as evidence that McDermott's failure to erect scaffolding was unreasonable. The court also held that Barto's supervisors "failed to properly supervise Mr. Barto . . . , particularly since this was not a routine job and something he had never done

6

before." This reasoning again suggests that the district court was trying to discern whether McDermott had exercised a reasonable amount of care.

Because we find that the district court did not misunderstand the law, we will reverse the negligence finding only if it was clearly erroneous. *Jauch*, 470 F.3d at 213. We hold that it was not. The record reveals ample evidence that the standard practice for performing Barto's assigned task on DB 50 involved seamen figuring out their own makeshift methods of reaching the spooling drum.[1] The district court did not clearly err in finding that McDermott failed to provide Barto with a reasonably safe place to work by failing to provide him with an appropriate way to reach the spooling drum.

## B. Barto's Comparative Negligence

McDermott next challenges the district court's conclusion that Barto was not comparatively negligent for the accident. Again, this court "review[s] a district court's finding of negligence and apportionment of fault for clear error." *Jauch*, 470 F.3d at 213. We affirm based on this deferential standard of review.

We have held that:

> A seaman . . . is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education.

*Gautreaux*, 107 F.3d at 339. Comparative negligence "may reduce the amount of damages owed [to a seaman] proportionate to his share of fault." *Jauch*, 470

---

[1] In particular, the DB 50 superintendent testified that using fir boards as scaffolding was acceptable and had been done in the past; a DB 50 leaderman testified that using a fir board was safe and that he had done so himself; and a more experienced DB 50 rigger testified that he had stood on top of the frame and used a brass hammer to perform Barto's task. Two of Barto's supervisors also testified that they saw him standing on either a board or the frame, and they apparently thought nothing of it. Admittedly, these supervisors testified that Barto was standing only two feet from the deck. But the district court found Barto's recollection that he was about four feet from the deck to be more credible.

F.3d at 213.  The burden of proving comparative negligence is on the Jones Act employer.  *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008) ("[C]ontributory negligence is an affirmative defense [in a Jones Act case.]").

McDermott argues that Barto was comparatively negligent because he selected an improper board (i.e., a fir board with a notch in it) and failed to secure the board to the spooling machine's frame.  The district court did not specifically explain why Barto was not negligent, even though he selected a notched board and failed to secure it.  But the court generally explained its decision not to "impose any comparative fault," noting that Barto "was the low man on the totem pole.  He was the least experienced.  He had never performed this work before."

Moreover, the district court credited Barto's testimony that he had placed the notched end of the board over the frame such that the notched end was not supporting any part of his weight.  The DB 50 superintendent testified that, if the notched portion had overhung the frame, "I think the board would have held [Barto's] weight."  Also, the board apparently *did* hold Barto's weight for 25 to 30 minutes, further supporting an inference that Barto's selection of the board was not negligent.  The district court therefore did not clearly err by finding that McDermott failed to prove that Barto was negligent in his selection of the board, given how he placed it on the frame.

McDermott also did not demonstrate that a reasonable seaman with Barto's "own experience, training, or education" would have realized that he had to secure the board.  *See Gautreaux*, 107 F.3d at 339 ("The circumstances of a seaman's employment include . . . his own experience, training, or education.").  Indeed, a DB 50 leaderman, Vallecillo, testified that, "[i]f I would have seen that the board wasn't banded [(i.e., wasn't secured to the frame)], I *probably* would have tell him something, but I didn't see that" (emphasis added).  This testimony seems to indicate that even a leaderman would not

view the failure to secure the board as particularly unsafe, given that Vallecillo was unsure whether he would have told Barto to get off an unsecured board. To be sure, McDermott also presented evidence from a barge foreman that the board should have been secured to the frame. But again, McDermott bore the burden of proving that Barto was negligent, given his relative inexperience. Notably, the only other rigger who testified did not opine that the board should have been secured. And McDermott adduced no other testimony that a relatively inexperienced rigger like Barto should have known to secure the board. Further, there was no testimony that the people who had previously used fir boards to perform Barto's task had secured the boards. The district court therefore did not clearly err in finding that McDermott did not prove Barto's comparative negligence, given his relative inexperience.

## C. Future General Damages

McDermott also challenges the district court's award of future general damages in the amount of $400,000. "A district court's damages award is a finding of fact, which this court reviews for excessiveness using the clear error standard." *Lebron v. United States*, 279 F.3d 321, 325 (5th Cir. 2002). "Put otherwise, '[w]e do not reverse a verdict for excessiveness except on the strongest of showings.'" *Id.* (quoting *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985)) (alteration in original).

Future general damages are available "for pain and suffering and impact on one's normal life routines." *Crador v. La. Dep't of Highways*, 625 F.2d 1227, 1230 (5th Cir. 1980). On appeal, McDermott focuses its argument on *only* pain and suffering, arguing that there is no evidence that Barto's pain will return now that he has had surgery. McDermott does *not* argue that Barto will be able to return to his normal life routines. This is particularly important because the district court noted that "[t]here is no question he's going to continue to need to be followed and will have some rather significant

9

permanent restrictions, as has been testified to by Dr. Munshi, with residual pain." Further, the district court's future general damages award specifically contemplated, in part, Barto's "permanent restriction of normal living—normal life activities and so forth." And Barto presented evidence that his life activities would be limited. He testified that he could no longer do things he enjoyed, such as "jogging, lifting weights, baseball, basketball, a lot of sports," "yard work," "fix[ing] on my car," and "[p]lay[ing] with my kids." And Dr. Munshi testified that, even if the surgery was completely successful, he expected that Barto would indefinitely need to avoid "[a]nything that puts a lot of stress on his back."

At oral argument, McDermott maintained that Barto produced insufficient evidence of the impact on his normal life routines. Specifically, McDermott argued that a seaman's own uncorroborated, self-serving testimony is not enough to prove this impact. This argument fails for three reasons. First, McDermott did not raise this argument in its appellate brief, so it is waived. *E.g.*, *Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 325 n.3 (5th Cir. 2001). Second, Barto's testimony *was* corroborated: Dr. Munshi testified that, even after the surgery, Barto's recreational activities would likely be restricted. Third, even if Barto's testimony were uncorroborated, the mere fact that testimony is uncorroborated and self-serving does not automatically mean that a factfinder is prohibited from crediting it. *See, e.g.*, *Curry v. Fluor Drilling Servs., Inc.*, 715 F.2d 893, 895 (5th Cir. 1983) (rejecting defendant's complaint that district court credited plaintiff's self-serving and uncorroborated testimony).[2]

---

[2] We note that McDermott has not raised an excessiveness challenge to the component of future general damages that compensates Barto for the impact on his normal life routines. We therefore express no opinion on whether the award was excessive.

McDermott next argues that the future general damages award violates our maximum recovery rule. "This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least *one factually similar* case from the relevant jurisdiction." *Lebron*, 279 F.3d at 326 (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990)) (internal quotation mark omitted).

McDermott has not demonstrated that the rule is applicable here because it has not pointed to a damages award in a "*factually similar* case from the relevant jurisdiction." *Id.* In particular, in the case that McDermott offers as a comparator, the court awarded "$50,000 for future physical and mental pain and suffering." *Aycock v. Ensco Offshore Co.*, 833 So.2d 1246, 1248 (La. Ct. App. 2002). Nothing indicates that this award accounted for the "impact on [the plaintiff's] normal life routines." *Crador*, 625 F.2d at 1230. In contrast, the $400,000 award here explicitly accounted for the impact on Barto's everyday life. Thus, McDermott has failed to advance a suitable comparator for Barto's future general damages award, so the maximum recovery rule does not even come into play. *See Lebron*, 279 F.3d at 326 (noting that the maximum recovery rule "'does not become operative unless the award exceeds 133% of the highest previous recovery in the [relevant jurisdiction]' for a factually similar case" (quoting *Douglass*, 897 F.2d at 1344 n.14) (alteration in original)).

**D. Future Lost Wages**

McDermott's final argument is that the district court erred by calculating Barto's lost wages according to an above-average work-life expectancy. A damages award for future lost wages should generally be based upon a seaman's work-life expectancy, meaning "the average number of years that a person of a certain age will both live *and* work." *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984). "Such an average is not

conclusive. It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live *and* work a longer, or shorter, period than the average." *Id.* "Absent such evidence, however, computations should be based on the statistical average." *Id.*

Here, the district court noted that expert economists provided wage loss estimates for work-life expectancies of age 55 to "age 67, which is the Social Security requirement age for Mr. Barto." The district court then said, "What I'm going to do is award something in the middle. I think that's a reasonable estimation of his loss of future earning capacity." Accordingly, the district court awarded Barto $300,000 for future lost wages. McDermott argues that the district court erred by relying upon an above-average work-life expectancy.

Barto's expert economist provided a range of estimates for Barto's future lost wages for two different retirement ages: 55.8 and 67. The age of 55.8 was selected based on a table of statistical work-life expectancies that had been prepared by other economists. In contrast, the age of 67 was selected because it is Barto's "full retirement age, as determined by the Social Security Administration." McDermott's expert economist provided a different range of estimates based on a retirement age of 58.2, which its expert selected based on a work-life expectancy table from the U.S. Department of Labor's Bureau of Labor Statistics.

Barto's economist did not provide any reason to believe that Barto would continue to work past his statistical work-life expectancy. The only relevant evidence Barto presented at trial was his testimony that he plans to work "[a]s long as I can retire. Whatever the retirement age is." This scant evidence was not enough to show that Barto "by virtue of his health or occupation or other factors, is likely to live *and* work a longer, or shorter, period than the average." *Madore*, 732 F.2d at 478. For one thing, Barto did not specifically testify that he planned to work until age 67. And nothing indicates that Barto knew that

this was the Social Security retirement age. Moreover, even if the district court believed that Barto wanted to work until age 67, *wanting* to work until age 67 is not the only or even the most significant factor in determining whether someone actually *will* work until age 67. As we have previously pointed out, an employee "might have become disabled before [the Social Security retirement age] as a result of illness or some other misadventure." *Id.* Or the employee "might have died before then." *Id.* Certainly Barto presented no evidence that such events were particularly unlikely given his health or other factors. Barto therefore did not successfully rebut the presumption that the average work-life expectancy should apply.

McDermott asks us to render judgment, reducing the future lost wages award from $300,000 to $209,533. The district court explicitly credited the vocational expert's opinion that Barto could still work as an unarmed security guard. Barto's own expert economist determined that his net future lost wages would be $209,533 if he worked as an unarmed security guard and retired at age 55.8. We therefore find it appropriate to render judgment in the amount of $209,533 for future lost wages.

Barto contended at oral argument that we should instead remand for the district court to determine future lost wages based on a retirement age of 58.2, the age selected by McDermott's expert economist. This age is about 2.5 years longer than the statistical work-life expectancy selected by Barto's expert economist. But at trial, Barto failed to provide an expert opinion on future lost wages assuming a retirement age of 58.2. "It is a basic concept of damages that they must be proved by the party seeking them." *Servicios-Expoarma, C.A. v Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 995 (5th Cir. 1998). Barto should have presented a revised expert opinion at trial if he intended to argue that McDermott's slightly higher work-life expectancy should apply. We decline to remand to give Barto a second chance to prove future lost wages.

13

**E. Cure**

Shore's sole argument on appeal is that Barto did not prove that the lumbar surgery was intended to improve his physical condition, so the surgery's cost was not available as cure. This question of fact is reviewed for clear error. *Becker*, 586 F.3d at 365. Moreover, "when there are ambiguities or doubts [as to a seaman's right to receive maintenance and cure], they are to be resolved in favor of the seaman." *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990) (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)) (internal quotation marks omitted) (alteration in original).

"Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman . . . until the point of 'maximum cure.'" *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979). Maximum cure occurs "when it appears probable that further treatment will result in no *betterment* of the seaman's condition." *Id.* "Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *Id.* It logically follows that, "when a particular medical procedure is merely palliative in nature or serves only to relieve pain and suffering, no duty to provide payments for cure exists." *Johnston v. Tidewater Marine Serv.*, No. 96-30595, 116 F.3d 478, 1997 WL 256881, at *2 (5th Cir. Apr. 23, 1997) (per curiam) (unpublished table opinion). For example, if a seaman's epilepsy is caused by scarring in his brain, medicine for "[c]ontrol of seizures is not a cure, for the precipitative factor, the scarring, remains." *Stewart v. Waterman S.S. Corp.*, 288 F. Supp. 629, 633–35 (E.D. La. 1968), *aff'd*, 409 F.2d 1045 (5th Cir. 1969) (per curiam), *cited with approval in Pelotto*, 604 F.2d at 400.

Here, Dr. Munshi testified that the purpose of the surgery was to remove pressure from the nerve sac, which caused at least some of Barto's pain. The removal of pressure from the nerve sac would thereby better Barto's physical condition by curing the root cause of his pain rather than merely correcting the symptom (pain). The surgery was therefore curative rather than merely palliative in nature. The surgery also corrected a physical abnormality that existed in Barto's body (pressure on the nerve sac) and thereby bettered his physical condition by restoring it to a normal, healthy condition. The district court therefore did not clearly err by requiring Shore to pay for the surgery as cure, particularly given that any doubts about cure "are to be resolved in favor of the seaman," *Johnson*, 893 F.2d at 79.

## CONCLUSION

As to the award of future lost wages, we REVERSE and RENDER judgment that Barto is entitled to $209,533.00 for future lost wages against McDermott. In all other respects, we AFFIRM the district court's judgment.