# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 16, 2025

Lyle W. Cayce
Clerk

———————————

No. 24-10123

———————————

Henry Le; Dung Le,

*Plaintiffs—Appellees*,

*versus*

United States of America,

*Defendant—Appellant*.

———————————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-147

———————————————————————————

Before Elrod, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

In this case, a minor collision had serious and deadly consequences. After a postal vehicle struck his car, Michael Le was first hospitalized, then bedridden, and finally—during the pendency of this appeal—died. The district court found the Government liable and awarded commensurate damages. We AFFIRM.

No. 24-10123

## I.

This case begins with a collision between a United States Postal Service ("USPS") vehicle and Michael Le ("Mr. Le"). Prior to this collision, Mr. Le was a middle-aged father of two who lived with his family in Grand Prairie, Texas.[1] He also suffered from ankylosing spondylitis, a lifelong inflammatory disease that can severely damage joints and cause vertebrae to fuse together.[2] It is undisputed that at the time of the accident, Mr. Le suffered from advanced ankylosing spondylitis—as evidenced by his "hunched-forward posture" that restricted his ability to look upward and prevented him from standing up straight. Despite this condition, Mr. Le worked full time, completed household chores, and exercised.[3]

After work on May 4, 2018, Mr. Le was backing out of his driveway to pick his son up from school in his red Toyota Camry Solara when a USPS vehicle collided with his car.[4] Mr. Le was completely stopped in the street when the USPS vehicle driven by Jillian Williams struck the rear-right panel of Mr. Le's Toyota.[5] This initial collision was followed by a second; Mr. Le's

---

[1] His wife, Dung Le, is the other Plaintiff-Appellee in the instant appeal. Because of Mr. Le's passing on October 19, 2024 during the pendency of this appeal, we will use the past tense when appropriate.

[2] There is no cure for ankylosing spondylitis. In severe cases, new bones form on a patient's spine that can cause a permanent hunched posture and a heightened susceptibility to bone fractures at low levels of force. Mr. Le was diagnosed with this affliction in 1993.

[3] At the bench trial, Mrs. Le, Mr. Le, and Henry Le—their eldest son and the substituted party for his father—all testified to the fateful collision, as well as to Mr. Le's numerous activities and participation in society.

[4] Mr. Le backed out of his driveway—with his car facing his house and away from the street—at an angle so he could proceed to his left, in the opposite direction of a community mailbox. Mr. Le was struck by a USPS vehicle (the first impact) that was reversing down the street. Postal workers are trained to never reverse their mail trucks unless absolutely necessary.

[5] As the district court observed, both parties' accident reconstruction experts agreed that his vehicle was at a complete stop at the time of the first impact. In addition,

No. 24-10123

car accelerated for approximately six seconds over nearly ninety feet and collided with his neighbor's house.[6] As the district court noted, a typical person's reaction time to "a known event is a second and a half." Upon impact, the frontal airbag deployed and Mr. Le's car was brought to a stop by his neighbor's home.[7]

Mr. Le exited the vehicle and was able to walk with some assistance at first, but he collapsed soon after and was driven to a nearby emergency room by his son, Kevin Le.[8] Mr. Le was examined there and transported by helicopter to Baylor University Medical Center ("BUMC") in Dallas. Dr. Matthew Berchuck, an orthopedic spinal surgeon at BUMC, examined Mr. Le and made the decision to postpone surgery until the next morning when a fully equipped medical staff would be available.[9]

---

both experts agreed that the USPS vehicle's reversing speed was somewhere between 2.5 and 6 miles-per-hour at the time of the initial impact. The Government disputes the fact that Mr. Le wore his seatbelt during the collision.

[6] Mr. Le also collided with a privacy fence before he hit the house. The Government contends, as they did below, that Mr. Le crashed into the house at 20 miles-per-hour. The Plaintiffs contend that the impact speed was somewhere between 10 and 15 miles-per-hour.

[7] An additional contested point is whether the Toyota's pretensioner—a mechanism that tightens and locks automobile seatbelts in place in the event of a crash—had locked on impact. There was conflicting expert testimony on this point, and the district court concluded that the evidence presented was "inconclusive at best."

[8] The district court observed—with the aid of numerous eyewitnesses and police body camera footage—that Mr. Le was not immobilized on the ground directly after impact, but gradually lost the ability to support his own body weight.

[9] Here, Dr. Berchuck testified at trial and spoke of the intake, the complexity of the case, and how the "usual team" that would have been more accustomed to working on this type of case would be present the following morning. Dr. Berchuck testified that the staffing conditions and the desire for an MRI factored into his decision to postpone this surgery. He also testified that this case is "as difficult a case as you will ever see in spine surgery." Without such a high-risk surgery, Dr. Berchuck testified that Mr. Le faced a great risk of quadriplegia, paralysis, and death.

The next morning, Dr. Berchuck and his team began the surgery, but at a certain juncture Mr. Le's neuromonitoring signals were lost.[10] After changing course and opting for a different stabilizing technique, Dr. Berchuck ensured Mr. Le's spine was decompressed and ended the surgery.[11] Mr. Le's neurologic function never returned.[12]

While recovering from the spinal surgery, Mr. Le developed a post-operative infection that snowballed into an esophageal tear and fistula that necessitated the implantation of a permanent feeding tube.[13] Mr. Le's condition only grew worse, and he was repeatedly hospitalized to address recurring illnesses *and* the later amputation of both legs. As a result, Mr. Le was confined to his bed or wheelchair, and rarely left home.[14] As a result of the collision and proceeding events, Mr. Le had to use a catheter and a

---

[10] In this instance, the procedure Dr. Berchuck was performing had planned incisions and insertions on both the front and back of his neck. When the surgical team performed a controlled turn on Mr. Le after the first part of the surgery was complete, neuromonitoring signals were lost. Dr. Berchuck decided to change course at this point in the surgery and placed a different, longer plate inside Mr. Le as well as an external halo vest to stabilize Mr. Le's spine.

[11] At this point, neuromonitoring signals had not returned.

[12] There was not another attempted surgery. After three months at BUMC, Mr. Le went back to Grand Prairie a quadriplegic. This was not, however, the end of his extensive medical travails.

[13] The cost of feeding formula for Mr. Le was included in the cost of care that was computed by the parties.

[14] Mr. Le had a power wheelchair, but did not have a roll-in shower or a wheelchair-accessible van.

No. 24-10123

colostomy bag.[15] Prior to his passing, he experienced phantom pain from his amputated limbs, depression, and suicidal ideations.[16]

## II.

On February 26, 2022, Mr. Le and Mrs. Le filed and brought this action under the Federal Tort Claims Act ("FTCA") against the United States of America and the USPS in federal court.[17] Mr. and Mrs. Le alleged that Williams' negligence proximately caused their damages.

Under federal law, suits against the United States must be tried by the district court itself.[18] Federal courts apply the substantive law of the state

---

[15] Mr. Le could not eat food or take medicine—everything had to be crushed up and put through his feeding tube. Due to the level of chronic pain he experienced, he was on a three-times-a-day dosage of Pregabalin. On the day Mr. Le gave testimony, he timed his medication so his mind would be clear.

[16] Mr. Le also testified to the fact that his son Henry sacrificed going to college in order to care for his father.

[17] *See* 28 U.S.C. §§ 2671-2680. Prior to filing in federal district court, Mr. and Mrs. Le filed an administrative claim for $35,003,000.00 on May 1, 2020. They filed a "Claim for Damage, Injury or Death, Standard Form 95" with the Postal Service within two years from the date of the incident (May 4, 2018). Without final agency action in the interim, and with more than six months since they filed their administrative claim, the Plaintiffs in this suit exhausted their available administrative processes. *See* 28 U.S.C. §§ 2672, 2675. These were the proper parties under federal law because the FTCA grants a limited waiver of sovereign immunity against the federal government for tort claims involving federal employees—and makes the proper defendant the Government, not employees. *See* 28 U.S.C. § 2679(b)(1). The USPS driver, Jillian Williams, was operating the postal vehicle in the scope of her federal employment. The parties do not contest the negligent nature of her actions and how it contravened federal policy and training. Because of the build of the vehicle, postal trucks have "substantial blind spots" that mirrors do not appear to overcome. In fact, the vehicles are themselves equipped with signage telling drivers to *not* do the very thing Ms. Williams did: back up. The incident in question occurred within Texas' Northern District, just outside the Le residence in Grand Prairie, Texas. The district court found proper venue and proper subject matter jurisdiction under the FTCA. *See* 28 U.S.C. §§ 1391(e), 1402(b).

[18] *See* 28 U.S.C. § 2402. Here, Judge Reed Charles O'Connor conducted the bench trial.

No. 24-10123

where the alleged negligence occurred—to the extent state law is not precluded by federal law.[19] The district court conducted a four-day bench trial on April 24-27, 2023.

Both Plaintiffs and the Government presented the testimony of numerous medical and financial experts, as well as eyewitnesses and Plaintiffs themselves.[20] Plaintiffs claimed that Williams "negligently operated her postal truck, striking Mr. Le's vehicle and causing the fracture that ultimately led to his quadriplegia." In turn, the Government argued that Mr. Le bore most of the fault for his injuries by not wearing a seatbelt and causing the second impact into his neighbor's house. The Government also argued that Dr. Berchuck was a negligent actor both during and after Mr. Le's surgery because he rendered Mr. Le a permanent quadriplegic during surgery and failed to detect and treat a post-operative infection in a timely manner.[21]

On July 24, 2023, the district court published a 40-page opinion that found the United States to be jointly and severally liable for Mr. and Mrs. Le's damages. The damages for Mr. Le in this case included past and future medical expenses, loss of earnings, and intangible damages in the amount of

---

[19] *See* 28 U.S.C. § 1346(b)(1); *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1450 (5th Cir. 1990) (citing *Richards v. United States*, 369 U.S. 1, 6 (1962)).

[20] The Plaintiffs presented multiple fact witnesses, a biomechanical engineer (Dr. Peter DeLonga), two spinal surgeons (Dr. Matthew Berchuck and Dr. Hugh McPherson), an accident reconstructionist (Dr. Mike Andrews), a rehabilitation physician (Dr. Jason Marchetti), and a mechanical engineer (Dr. Jack Leifer). The Government presented its own set of expert witnesses, including a biomechanical engineer (Steven Storivk), an accident reconstructionist (David Danaher), a spinal surgeon (Dr. Matthew Colman), and a psychiatrist and nurse who each addressed future medical expenses (Dr. Hooman Sedighi and Wendy Knau).

[21] Because of this intervening negligence, the Government asserts that Dr. Berchuck is a responsible third party under TEX. CIV. PRAC. & REM. CODE ANN. § 33.004. As such, if any liability is found to exist for the Government, this would reduce its damages proportionally. Before trial, the district court denied the Government's motion to designate Dr. Berchuck and other BUMC medical practitioners as responsible third parties, but then reconsidered its prior decision as to Dr. Berchuck.

No. 24-10123

$23,908,479.73. The damages for Mrs. Le in this case included past and future loss of consortium and loss of services in the amount of $2,605,000.00. In the course of its decision, the district court found a number of facts that are directly pertinent to this appeal.[22]

After the district court handed down this judgment in July 2023, the Government filed a post-judgment motion for remittitur of non-economic damage awards based on the maximum recovery rule.[23] The district court denied this motion in a 23-page opinion that reviews its awards on Mr. Le's physical pain and mental anguish, physical impairment, disfigurement, and Mrs. Le's loss of consortium. Through its reasoning in the various categories of damages, the district court found the maximum recovery rule to be inapplicable to some categories because the awarded amounts were less than 133% of the highest inflation-adjusted award from factually similar state cases *or* an upward departure was warranted given the unique facts of Mr. and Mrs. Le's case.[24] The district court concluded that, because "none of the noneconomic damages challenged in the instant Motion are unreasonably excessive[,]" reduction under the maximum recovery rule was not required.

---

[22] This includes the following facts: the USPS employee was negligent in driving in reverse and her negligence was the proximate cause of Le's injuries; the first impact caused Mr. Le's spinal fracture and rendered him unable to remove his foot; the evidence presented by the Government on Mr. Le's seatbelt use was inconclusive *and* any non-use would not have cause his injuries; Mr. Le was not contributorily negligent; and Dr. Berchuck was not responsible for Mr. Le's quadriplegia or esophageal fistula.

[23] The Government also requested a new trial, or, in the alternative, an altered or amended judgment under FED. R. CIV. P. 59 (a) and (e). *See also* Barbara Lerner, *Remittitur Review*, 43 U. CHI. L. REV. 376, 392-97 (1976) (chronicling the foundation of the Fifth Circuit's maximum recovery rule in *Gorsalitz v. Olin Mathieson Chem. Corp.*, 429 F.2d 1033 (5th Cir. 1970)).

[24] *See Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002).

No. 24-10123

## III.

## A.

This Court reviews "findings of fact for clear error and conclusions of law *de novo*" when handling a bench trial appeal.[25] "The district court's proximate cause and negligence findings are findings of fact that we review for clear error."[26] Under FED. R. CIV. P. 52(a)(6), "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." As such, "[a] finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court based on all the evidence is left with the definitive and firm conviction that a mistake has been committed."[27]

"Factual findings made during a bench trial deserve 'great deference.'"[28] In addition, the "district court's finding of fact is clear error only if it is 'implausible in the light of the record considered as a whole.'"[29] As the Supreme Court noted, "[w]here there are two permissible views of the evidence, the factfinder's choice between them *cannot* be clearly

---

[25] *Flint Hills Res. LP v. Jag Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009) (citing *Houston Expl. Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004)). *See also Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006).

[26] *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009) (citing *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997) ("Causation is a question of fact [in Texas.]")).

[27] *Flint Hills*, 559 F.3d at 375 (quoting *Houston Exploration*, 359 F.3d at 779 (internal citations and quotation marks omitted)).

[28] *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022) (quoting *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)).

[29] *Hess*, 24 F.4th at 233 (quoting *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015) (quotation marks and citation omitted)).

8

No. 24-10123

erroneous."[30] And when "the trial court's findings . . . are based on determinations of credibility[,]" this Court "grant[s] even greater deference . . . ."[31]

## B.

Because this action arises under the FTCA, Texas substantive law controls.[32] As this Court has observed previously, "[u]nder Texas law, comparative responsibility expressly applies to negligence claims."[33] The district court—the trier of fact in this case—must "reduce a plaintiff's recovery in tort by the proportion []he contributed to causing h[is] own harm through actions that were negligent or otherwise fell below some legal standard."[34] If the plaintiff himself is found to have a percentage of responsibility greater than 50 percent, he "may not recover damages . . . ."[35]

The Government asserts a tripartite error is ensconced within the district court's opinion: that Mr. Le bore responsibility for crashing his car into his neighbor's home; that Mr. Le bore responsibility for failing to wear a seatbelt; and that Dr. Berchuck bears responsibility for causing Mr. Le's fistula. The Plaintiffs counter that Texas law requires the defendant to produce evidence of such assertions, and that the Government failed to produce the requisite evidence.

---

[30] *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (emphasis added).

[31] *Hess*, 24 F.4th at 233 (quoting *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 607 (5th Cir. 2020) (cleaned up)).

[32] *See* 28 U.S.C. § 1346(b).

[33] *Ellis v. United States*, 673 F.3d 367, 375 (5th Cir. 2012). The presence of the proportionate responsibility statute removes a "harsh system of absolute victory or total defeat" that would otherwise exist. *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 559 (Tex. 2015). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a).

[34] *Ellis*, 673 F.3d at 375.

[35] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001.

No. 24-10123

**1.**

First, the Government contends that the district court should have "entirely, or at least substantially, reduced plaintiffs' recovery because Mr. Le is primarily at fault for the second impact."[36] They cite to Mr. Le's statements after both impacts and to their expert witnesses—and conclude that Mr. Le panicked after the first impact and was not immobilized. The Plaintiffs, in turn, cite to three pieces of physical evidence that support the district court's finding that the first impact with the postal vehicle was the chain reaction that began this series of events.[37]

Relying on Mr. Le's pre-existing spinal affliction, which causes rigidity and brittleness of vertebrae, the district court understood this condition as the antecedent that facilitated this chain of events.[38] The district court noted that Mr. Le's condition made him prone to low-impact fractures. In the district court's eyes, Mr. Le's condition—paired with the force of the postal truck's collision with his car—compounded to fracture Mr. Le's vertebra. The district court examined scanned images of Mr. Le's fracture

---

[36] They note that under Texas law, "all drivers owe a general duty to exercise the ordinary care that a reasonably prudent person would exercise under the same circumstances," which would include maintaining control of the car and applying the brakes when necessary. *Pleasant v. Hernandez*, No. 14-21-00617-CV, 2022 WL 3655176, at *4 (Tex. App.—Houston [14th Dist.] Aug. 25, 2022, no pet.).

[37] In sum, the evidence that daisy-chains together as follows: Mr. Le's underlying ankylosing spondylitis enabled an asymmetric vertebra fracture—which the computed tomography scan captured—that was consistent with the angle of the first impact. This fracture led to "transient neurological dysfunction" that then disabled him from removing his foot from the accelerator.

[38] This condition is undisputed for its ability to render afflicted individuals more susceptible to spinal fractures at lower levels of force than those without the disease. In fact, it was undisputed that a simple slip-and-fall accident could cause severe fractures of the kind suffered by Mr. Le.

and found the available evidence to support the conclusion that the first impact caused the fracture.[39]

The district court found that the first impact caused a fragmented piece of his vertebra to fluctuate between pinching and not pinching his spine.[40] This "transient neurological dysfunction" resulted in disruption of motor control to Mr. Le's right leg and foot.[41] This fluctuation, to the district court, explained why Mr. Le was unable to stop, and caused him to barrel straight towards his neighbor's house for six seconds before crashing.

The Government relies heavily on Dr. Colman's expert opinion that the spinal fracture could not have happened from the first impact. The Plaintiffs rebut this with their own expert's testimony and the presence of Mr. Le's pre-existing condition.[42]

Next, the Government assails the district court's finding of a "transient neurological dysfunction" and cites to statements Mr. Le made to the responding officer and to medical responders. The Plaintiffs respond with their own swath of competing evidence—all of which was before the district

---

[39] Specifically, the Plaintiffs note that the fracture was in an asymmetric pattern consistent with the head being moved rearward and to the right.

[40] The Government contends, and cites to their expert, that if the first impact resulted in a fracture, the second impact would have been immediately paralyzing. The Government also argues that one of their experts ruled it *equally* consistent with the second impact.

[41] The police body camera footage show that Mr. Le was unable to move his right foot up after the crash.

[42] In addition to this, the Plaintiffs observe that Dr. Colman's opinion was devoid of critical details—including the "amount or direction of force in the second impact, the change in velocity, Le's movement in the vehicle, the cushioning provided by the frontal airbag, and the restraint provided by the seatbelt[.]" The Plaintiffs argue that these deficiencies, paired with a lack of peer-reviewed studies and testing, makes the district court's rejection of Dr. Colman's testimony proper. The Plaintiffs are correct that the district court's rejection of Colman's hypothesis was "based on determinations of credibility" and thus receives "even greater deference[.]" *Hess Corp.*, 26 F.4th at 233.

court—and explain that he was confused, and in some instances drugged, when making those statements. Moreover, the Plaintiffs emphasize the fact that Mr. Le had six seconds to respond to the initial impact and pump the brakes on his car, and despite the Government's assertion that he had control over his car, the second impact itself demonstrates he lost control.

Finally, the Government contends that the fracture pattern was not caused by the first impact, yet the Plaintiffs observe that their expert found the pattern to be *equally* consistent with the first impact. This is the type of call a district court is best suited to make—and without more definitive evidence from the Government—there is no error, much less *clear* error.[43]

Mr. Le was not the typical driver or middle-aged man. He suffered from a degenerative disease that made him very susceptible to spinal fractures from minor impacts. As such, it is quite possible that the initial tortious collision with the USPS vehicle could have rendered him incapable of braking. It took six seconds for Mr. Le to crash through a fence and into his neighbors' house. With his right leg and foot working as they normally would, Mr. Le could and would have stopped. The Government did not meet their burden.[44]  We see no clear error in the district court's conclusion that the first impact was the proximate cause of the second.

---

[43] *Anderson*, 470 U.S. at 574. This situation is the epitome of the factfinder's choice.

[44] In addition, the Government in its reply brief argues that the "only plausible version of events" is that Mr. Le suffered his eventual paralysis from the second, and not the first impact, because he lost control of his legs from the first impact, then regained control after the second impact. What they fail to account for in this rendition, however, is that "transient neurological dysfunction" is possible in this scenario and here they did not disprove it with concrete, clear proof. While ankylosing spondylitis patients can suffer severe fractures from small impacts, it is unrefuted that a transient dysfunction is also possible. Simply asserting that it is not plausible is not proof that *it is*, in fact, implausible.

**2.**

Second, the Government asserts that the district court erred in finding that Mr. Le did not contribute to his injuries by not wearing a seatbelt. Observing that the Supreme Court of Texas has recognized that, "a plaintiff who breaks the law or otherwise acts negligently by not using a seat belt is at least partially responsible for the harm that befalls him[,]" the Government contends that there is overwhelming evidence that Mr. Le was not using a seatbelt at the time of the collision.[45] The district court determined it was not necessary to make a finding of whether he was wearing a seatbelt at the time of the collision because of its finding that the first impact caused spinal fragmentation.

The Plaintiffs observe that while there is testimony from an EMT that Mr. Le told him he was not wearing a seatbelt, there are also conflicting police report notes and first responder records stating the opposite. Mr. Le, Mrs. Le, Kevin Le, and Henry Le all testified that he was a "habitual seat belt-wearer" and that he did buckle up on the day in question. As such, the district court was presented with conflicting, but mostly concurring, evidentiary points of seat belt use.

At trial, the Government attempted to show that the "seatbelt tensioner" was "stowed" and that this proved he was not wearing it at the time the airbag deployed. The district court noted, however, that *neither* party determined if the pretensioner was operable and did, in fact, deploy during the second impact. There were competing expert opinions, and with the lack of any diagnostic tests performed on the car part in question, the district court concluded that there was *not* conclusive evidence of Mr. Le's nonuse of the seatbelt.

What matters for the purpose of this analysis is whether usage of a seatbelt would have reduced additional stress on Mr. Le's spine and

---

[45] *Nabors*, 456 S.W.3d at 562.

prevented his quadriplegia. Without more concrete evidence of cause-in fact by the Government (other than the fact that there *could* have been more stress on his spine) and without clear proof that Mr. Le was not wearing his seat belt, the factual determination reverts to the trier of fact's determination.[46] We find no clear error as to the district court's finding.

**3.**

Third, the Government contends that Dr. Berchuck, the BUMC doctor who performed surgery on Mr. Le, is partially at fault for Mr. Le's post-operative fistula. Under Texas law, the Government must show "(1) the physician's duty to act according to an applicable standard of care; (2) [the physician's] breach of that standard of care; (3) injury; and (4) causation."[47] The Supreme Court of Texas has determined that the standard of care for a physician is "what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances."[48]

At trial, the Government argued that BUMC practitioners and Dr. Berchuck were partially responsible for his quadriplegia—a claim they now abandon on appeal.[49] The primary piece of evidence they use to carry forward their one preserved claim (that Dr. Berchuck failed to timely treat and detect the fistula) is Dr. Colman's testimony as one of their expert witnesses. The district court considered this testimony and found that it was insufficient to establish the applicable standard of care, any breach by Dr. Berchuck, or causation in connection with the esophageal tear.

---

[46] All the Government offers this Court is conjecture about loose car parts, paired with the hot Texas sun warping plastic in a 14-year-old car, and an owner's manual that explicitly states that pretensioners do not always work as intended for this model. This fact universe is inadequate for a finding of clear error on behalf of the factfinder.

[47] *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008); *see also Ellis*, 673 F.3d at 374.

[48] *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019).

[49] The district court found otherwise.

No. 24-10123

Under Texas law, a claimant must show that "a doctor of ordinary prudence in that particular field would or would not [have undertaken the action] under the circumstances."[50] In particular, a determination of a breached standard "cannot be determined absent specific information about what the [doctor] should have done differently."[51] Using Texas caselaw, the district court found that there was *not* a reasonable medical probability that Dr. Berchuck caused or contributed to the injury.

At trial, Dr. Colman stated that Dr. Berchuck "need[ed] to recognize" post-operative complications—but did not elaborate on how he had the primary or sole responsibility for post-operative care at a facility such as BUMC.[52] Without this information, however, it is impossible to determine if there was clear error in determining that Dr. Berchuck was the person responsible for not catching the tear in time.

Furthermore, the Plaintiffs note that Dr. Colman did not explain when the tear should have been recognized, when it was recognized, what Dr. Berchuck actually did or did not do, or when his tortious act or omission occurred.[53] We view Dr. Colman's testimony as to this specific matter as "improperly equat[ing] negligence with a bad or unsuccessful result."[54] We find no clear error on the district court's part.

––––––––––––––––––––––––––––––

[50] *Windrum*, 581 S.W.3d at 768. *See also Hollis v. United States*, 323 F.3d 330, 336 (5th Cir. 2003).

[51] *Windrum*, 581 S.W.3d at 768. As the Supreme Court of Texas elaborated, this information cannot be a "conclusory statement" from an expert "with no basis or explanation." *Id.*

[52] The Government is correct to point out that it is the "substance and context" of Dr. Colman's testimony that matters. *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App.—Amarillo 2003, no pet.).

[53] The Plaintiffs also note that in *Windrum*, the expert witness used specific medical records, textbooks, deposition testimony, and other evidence to form his opinion. 581 S.W.3d at 770-73.

[54] *Id.* at 773.

15

No. 24-10123

## IV.

With liability affirmed, the great denouement of damages comes to the fore. "A court's damages award is a finding of fact reviewed for clear error."[55] "As such, the award is not clearly erroneous if it is plausible in the light of the record."[56] Furthermore, an award will not be "revers[ed] . . . for excessiveness except on the strongest showings" that it "exceeds the bounds of reasonable recovery."[57] It must be noted that "[w]hen this court is left with the perception that the verdict is clearly excessive, deference must be abandoned."[58] We also note, however, that this Court "review[s] with deference damage awards based on intangible harm."[59]

In the Fifth Circuit, we "use[] the 'maximum recovery rule' to determine whether an award is excessive."[60] Applying this rule, "this [C]ourt 'will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction.'"[61] For bench trials, we will not overturn awards that are within 133% of the highest comparable award, adjusting for inflation.[62]

---

[55] *Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172, 180 (5th Cir. 2020) (citing *Barto v. Shore Constr., L.L.C.*, 801 F.3d 465, 473 (5th Cir. 2015)).

[56] *Id.* (citing *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574 (5th Cir. 2015)).

[57] *Lebron*, 279 F.3d at 325.

[58] *Id.* (citing *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995)).

[59] *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487-88 (5th Cir. 2001).

[60] *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019).

[61] *Id.* (citing *Lebron*, 279 F.3d at 326).

[62] *Lebron*, 279 F.3d at 326.

No. 24-10123

Here, the relevant jurisdiction to draw caselaw from is Texas because the substantive law for the claim is Texas-sourced.[63] The maximum recovery rule is not operative "unless the award exceeds 133% of the highest previous recovery in the state" adjusted for inflation.[64] "[A] departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw'"[65] In addition, only published decisions are available for the comparability inquiry.[66]

The Government challenges four portions of the district court's awards for Mr. Le's: (A) past physical pain and mental anguish; (B) future physical pain and mental anguish; (C) past physical impairment; (D) future physical impairment; and (E) past and future disfigurement.

## A.

The district court awarded $1,500,000 for past physical pain and suffering and $750,000 for past mental anguish. The district court noted Mr. Le's "grueling physical, mental, and emotional pain" that had resulted from his quadriplegia, amputations, and esophageal fistula—on top of the "severe depression, periodic suicidality, sleep deprivation, and loss of appetite" that

---

[63] *Puga*, 922 F.3d at 297. For cases arising under federal law such as this one, the maximum recovery rule—not Texas substantive law—applies. *See Harris v. FedEx Corp. Servs.*, 92 F.4th 286, 299 n.10 (5th Cir. 2024).

[64] *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 n.14 (5th Cir. 1990).

[65] *Lebron*, 279 F.3d at 326 (quoting *Douglass*, 897 F.2d at 1339).

[66] *Id.* at 326-27; *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019).

No. 24-10123

had resulted from these harms.[67] The district court used *Holcombe v. United States* as a marker for damages.[68]

The Government attempts to distinguish this by arguing that *Holcombe* was never affirmed by the Fifth Circuit and as such, should not carry precedential value, and cite cases that do not involve permanent paralysis or amputation as comparators.[69] Furthermore, the Government also argues that *Holcombe* is too distant to be a comparator. This is incorrect. In *Holcombe*, there was a shooting at a church where the plaintiff was shot multiple times, and afterwards he had to catheterize his bladder and manually evacuate his bowels.[70] Mr. Le was not a shooting victim—*but* his injuries were remarkably akin to the plaintiff in *Holcombe*.

The district court rendered separate awards at the trial level for past physical pain and past mental anguish. When it conducted its maximum recovery analysis, it combined the awards. The district court delineated exactly what each award was for—and split up the awards by backward- and forward-looking analyses—and was thus as precise as necessary.

---

[67] This Court has previously compared a jury award for future physical pain with two Texas cases that reviewed combined awards for future physical pain and mental anguish. *See Longoria*, 932 F.3d at 366-67.

[68] 584 F. Supp. 3d 225 (W.D. Tex. 2022). In both cases, the Plaintiffs share permanent paralysis in their lower extremities, as well as similar manifestations of the physical and mental suffering that accompany such a condition.

[69] The Fifth Circuit dismissed this argument as frivolous in *Douglass*. 897 F.2d at 1344 (noting that "[a]wards imposed by district courts do not . . . serve as precedent only upon review.").

[70] The Government fails to note, however, that Mr. Le had a catheter and colostomy bag as well. In addition, the *how* of the harm is not dispositive for the purpose of a comparator. While it may play some factor into the "mental anguish" portion of the analysis, both physical and mental injuries are what are compared and recompensed. As such, lower extremity paralysis, lack of bowel and bladder control, and other comparators all align in this case.

No. 24-10123

Previously in this Court, the issue was that the district court did not differentiate between past and future damages for suffering and loss of companionship.[71] This is not an issue here; *Vogler* does not bind the hands of the district courts in considering damages when they fall beneath the comparator case when combined. The district court did not clearly err when it awarded Mr. Le less than half of what the *Holcombe* court awarded.

**B.**

The district court awarded $4,400,000 for both future physical pain and future mental anguish. At trial, the Le family presented evidence on Mr. Le's pain and mental anguish, and there is no evidence that his quadriplegia, amputations, and esophageal tears did not persist until his eventual passing.

The district court relied on *National County Mutual Fire Insurance Co. v. Howard*, a case where the plaintiff was a quadriplegic.[72] The district court noted that it exceeded the 133%-plus-inflation calculation but concluded that the deviation was derivative of his additional injuries including his fistula, amputated legs, depression and suicidality, and other physical and mental complications. The Government challenges this comparator for being "aggregative" and thus in violation of *Vogler*'s (narrow, time-oriented) ruling.[73] We reject this argument and find that the district court did not err in its damages award for future physical pain and mental anguish.

**C.**

The district court noted that Mr. Le's quadriplegia rendered him unable to perform basic chores, participate in sports, hobbies, or recreational activities—and awarded him $2,000,000 for past physical impairment. The

---

[71] *Vogler v. Blackmore*, 352 F.3d 150, 156-57 (5th Cir. 2003).

[72] 749 S.W.2d 618, 622 (Tex. App.—Fort Worth 1988, writ denied).

[73] The Government continues to cite cases where the plaintiffs did not suffer from severe quadriplegia and amputation and fistulas.

Government cited to a case with a much smaller award of $100,000 for a plaintiff who became a quadriplegic who used a catheter and colostomy bag.[74] In its denial of remittitur motion, the district court cites to *Holcombe* once more, and found its award to be under the $3,000,000 by a significant amount. The Plaintiffs note that the victim in *Holcombe* was still able to maintain hobbies and other activities—something Mr. Le was not able to do—and as such he deserved more than $2,000,000. Here, *Holcombe* is a proper upper bound for the district court to use. Given the significant downward departure the district court decided on, we find that the district court did not clearly err in using *Holcombe*.

## D.

In awarding Mr. Le $5,200,000 for future physical impairment, the district court used a Texas Court of Appeals case—*General Motors Corp. v. Burry*—to compare.[75] The plaintiff in *Burry* had suffered a severe brain injury, but the district court reasoned that his impairment was comparable. Like Mr. Le post-accident, the *Burry* plaintiff was also limited almost entirely from hobbies, activities, and personal maintenance. It is not clear that the district court plainly erred, as Mr. Le was more diminished in many ways than the relevant *Holcombe* plaintiff.[76] This made Mr. Le's situation of future impairment akin to *Burry* in effect. We affirm the district court's award.

## E.

Finally, the district court awarded $1,800,000 for past and future disfigurement to Mr. Le. The district court took notice of Mr. Le's "bodily deformities and contortions resulting from his injuries, including his amputated legs[.]" The Plaintiffs cite to *Baptist Memorial Hospital System v.*

---

[74] *Reeder v. Allport*, 218 S.W.3d 817, 820 (Tex. App.—Beaumont 2007, no pet.).

[75] 203 S.W.3d 514 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

[76] *See Holcombe*, 584 F. Supp. 3d at 315-18. The plaintiff in *Holcombe* was awarded $3,000,000 for future physical impairment, the same sum as the past impairment figure.

*Smith*, a case where the plaintiff had persistent flexion contractures of his limbs.[77] The Government cites to *Holcombe* as a comparator for disfigurement—despite the plaintiff in that action not having fistula or a double amputation like Mr. Le. This damages award is lower than in *Smith*, and the disfigurement is as severe. The district court did not commit clear error in determining that this was a comparable case.

## V.

Four hundred and fifty-three days after the district court rendered final judgment, and seventy-two days after this case had been fully submitted to this Court, Mr. Le died.[78] The Government waited until oral argument to assert that Mr. Le's death nullifies the final judgment and renders any future damages awards inequitable. The exact opposite is true.

The Government offers no answer to that reality and cites no cases that suggest a plaintiff's death during the pendency of an appeal has such effect on the final judgment. We reject the assertion that a plaintiff's post-judgment death alone affects the damages awards, even when death cuts a life short compared to the calculated life expectancy.[79] To rule otherwise

---

[77] 940 S.W.2d 128 (Tex. App.—San Antonio 1996, writ granted).

[78] The Government's reply brief was filed on August 30, 2024.

[79] *See, e.g.*, *Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129 (6th Cir. 1990). In *Davis*, the Sixth Circuit reasoned that a plaintiff passing away 33 days after the district court entered the verdict and judgment—but before post-judgment motions had been resolved—did not qualify as "substantial injustice" demanding the reopening of a case. *Id.* at 135-36. We agree. Here, as there, the defendant contends that because the plaintiff passed before expected, "substantial injustice" would flow from leaving the final judgment undisturbed. *Id.* The present situation is no more a deprivation of "substantial injustice" than if Mr. Le had outlived his expected life span that served as the basis for his forward-looking damages awards. After all, as the *Davis* court aptly observed, "the [life expectancy] testimony regards an *expectancy*, not a certainty." *Id.* at 136 (emphasis added). Disturbing the finality of the district court's judgment would only serve as a windfall for potential tortfeasors to escape the bite of binding judgments. *See also Bailey v. Travelers Ins. Co.*, 383 S.W.2d 562, 564 (Tex. 1964) (upholding a judgment in light of the plaintiff's passing and noting the

would manufacture inequity, uncertainty, and arbitrariness. Such inequity has not gone unnoticed in other cases across the country.[80]

The district court—using all available evidence—made an informed determination on life expectancy and entered final judgment in favor of Mr. Le. Adopting the number presented by the Government's expert witness, the district court found Mr. Le's life expectancy to have been 12.6 years. In doing so, the district court rejected the Plaintiffs' expert witness' testimony that Mr. Le's life expectancy was approximately 20 years. No one suggests that if he had lived longer, the awards ought to be adjusted upwards.

As such, Mr. Le's damages awards are preserved for his estate.[81]

## VI.

The Government did not clear the high bar of showing clear error below in the district court's apportionment of liability or calculation of damages. We AFFIRM the able district court on all findings.

---

"harsh result" of ruling otherwise). In short, death pending appeal does not extinguish damages awards. Instead, the awards persist as part of the decedent's estate.

[80] *See, e.g.*, *LeBlanc v. Metal Locking of La., Inc.*, 258 So.2d 683, 686 (La. Ct. App. 1972); *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 213-14 (Tenn. Ct. App. 2008); *Sharon v. SCC Pueblo Belmont Operating Co.*, 467 P.3d 1245, 1248 (Co. Ct. App. 2019); *Marasa v. Atl. Sounding Co., Inc.*, 557 Fed. App'x 14, 19-20 (2d Cir. Jan. 29, 2014) (summ. order); *West v. United States*, No. 3:07CV581TSL-JCS, 2009 WL 2169852, at *5-6 (S.D. Miss. July 20, 2009).

[81] As the independent executor of Michael Le's estate, Henry Le was properly substituted for his father. *See* FED. R. CIV. P. 25(a); FED. R. APP. P. 43(a)(1). On February 19, 2025, Henry was appointed as the independent executor of his father's estate. Five days later, Henry filed his oath with the Dallas County Probate Court. The Clerk of Dallas County and the Probate Courts of Dallas County issued letters testamentary that authorized Henry to act as the independent executor on February 26, 2025.